PHILLIP H. DENNIS AND PATRICIA DENNIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dennis v. Commissioner
Docket No. 19773-81.
United States Tax Court
T.C. Memo 1984-4; 1984 Tax Ct. Memo LEXIS 670; 47 T.C.M. (CCH) 815; T.C.M. (RIA) 84004; January 3, 1984. Ronald D. Stanley, for the petitioners. Matthew J. Fritz, for the respondent. MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Additions to Tax Under Sections
Year
Deficiency
6651(a)
6653(a) [1]
1973
$ 21,396
$  1,137
$   -- 1974
59,149
4,977
3,289
1975
58,849
11,770
3,777
After concessions by the parties, the issues presented for our decision are: (1) Whether petitioners' *672 farming operation (primarily cattle raising) was an "activity * * * not engaged in for profit" within the meaning of section 183(a); and (2) Whether any part of petitioners' underpayment of tax for taxable years 1974 and 1975 was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners, Phillip Dennis and Patricia Dennis, husband and wife, resided in Edwardsville, Illinois at the time they filed their petition in this case. They filed joint Federal income tax returns for the years 1973 through 1975 [2] with the Internal Revenue Service Center in Kansas City, Missouri. During the years in issue, petitioner Phillip Dennis was a medical doctor in St. Louis specializing the practice of psychiatry. Petitioner Patricia Dennis was a housewife not regularly *673 employed outside the home. Issue 1. Farm Losses
In November 1970, petitioners purchase 120 acres of farm land (the "Warner farm") in Phelps County, Missouri for $ 10,440. This property was located approximately 125 miles from petitioners' residence and place of business in St. Louis. [3] The only improvement on the farm at the time of purchase was an old house which was subsequently used as a shed for the storage of machinery. Petitioners assigned no value to this structure for purposes of depreciation. In 1972, petitioners expanded their farm by purchasing a one-half interest in a neighboring 160-acre farm (the "Goode Farm") for $ 18,000. [4] The remaining one-half interest in the farm was purchased by Marion Brown, the father of petitioner Patricia Dennis. [5] The Goode farm was improved with an eight-room frame farmhouse and another small building, both of which were assigned a value of $ 4,000 for purposes of depreciation. *674 In 1974, petitioners again expanded their farm by purchasing a 160-acre farm (the "O'Brien farm") for $ 25,000. The O'Brien farm was improved with an A-frame house to which the petitioners assigned a value of $ 5,000 for purposes of depreciation. The three farms purchased by petitioners, totalling 440 acres, are contiguous and been functionally used as one farming property since their acquisition. [6] Approximately 10 percent of the property was suitable for pasture and grazing with the balance consisting of timberland. *675 Shortly after acquiring the first portion of their farm, petitioners began preparing their farm for a cattle raising operation. In subsequent years petitioners installed fencing, cleared land for use as pasture, constructed buildings for cattle and the storage of machinery, and constructed a 15 to 20 acre lake and numerous ponds to provide water for the cattle. [7] They also spent considerable time and over $ 8,000 in capital expenditures in improving the farmhouse on the Goode Farm. [8]
Petitioners also purchased a considerable amount of equipment and machinery for use on the farm. Among the items listed by petitioners in their tax returns upon which depreciation was taken are the following: Property
Date Acquired
Cost
1966 Cadillac automobile
09/71
$  1,197
Caterpillar tractor D7E
02/72
27,760
Massey-Ferguson tractor
05/72
5,862
Holland-Md. 1467 haybine
06/72
2,100
Caterpillar tractor 955
07/72
7,745
Two-ton truck
07/72
4,052
Ford tractor
10/73
3,071
Ford P-U truck
01/74
4,000
Dump truck
03/74
4,200
Rome-type disc
08/74
1,023
Jeep P-U truck
02/75
1,700
Tractor, international model 175
10/75
4,804
Citizens bank equipment
--/75
1,468
*676 Petitioners also purchased numerous other less costly pieces of machinery such as posthole diggers, chain saws, plows, mowers, and welders. Petitioners began raising cattle on their farm in 1972 after purchasing a herd of purebred angus cattle. Petitioners' plan for their cattle operation was to produce 100 head of cattle per year at an average selling weight of 500 pounds and selling price of $ .40 per pound for total gross receipts of $ 20,000 per year. They anticipated they would need 100 cows and 4 bulls in order to produce 100 saleable animals each year. Petitioners estimated that at the end of five years of operation they would net approximately $ 5,000 annually from the farm. In actual operation, however, petitioners lost money from 1972 through 1979, and the largest annual gross receipts from the sale of livestock during that period was in 1978 when petitioners received $ 5,902.93. [9]
From 1972 through the years in issue, the day-to-day operation of the *677 farm was handled by a hired farm manager, Marvin Garner. Mr. Garner, who is the brother-in-law of Marion Brown, resided on petitioners' farm and was responsible for the cattle raising operation including the clearing of land and construction of ponds for watering cattle. [10] Petitioners, members of their immediate family, and other relatives, also performed general farm labors while visiting the farm on weekends. *678 In establishing and operating their farm, petitioners sought advice from a number of sources. They conferred with several family members, in particular, Marion Brown, who had previous experience with cattle raising as a youth. They obtained useful information from the Conservation Departments at the University of Rolla and the University of Illinois. Petitioners also had the soil of their farm analyzed by the Cooperative Extension Service at the University of Missouri - Columbia and in accordance with the Extension Service's recommendations applied limestone to the soil. During the years in issue, petitioners did not keep formal accounting records of their farm operation. They did, however, maintain two farm checking accounts and retained stockyard receipts which indicated the amount of income derived from the sale of livestock. Petitioners reported the following income and expenses from their farming operation on the Schedule F filed with their tax returns for taxable years 1972 through 1979: [11]
Profit
Year
Gross Income
Farm Expenses
Depreciation
or Loss
1972
$    --   $ 10,366.00
$  2,307.00
$ (12,673.00)
1973
1,788.14
22,513.61
14,365.60
(35,091.07)
1974
1,329.69
25,545.89
12,917.31
(37,093.51)
1975
3,812.00
* 35,337.00
12,923.00
(44,448.00)
1976
4,512.00
23,712.00
11,525.00
(30,725.00)
1977
4,004.62
14,495.98
9,893.00
(20,384.36)
1978
5,902.93
16,403.30
8,055.00
(18,555.37)
1979
8,267.30
8,917.20
8,231.00
(8,880.90)
Total
$ (207,851.21)
*679 * This figure includes an $87 deduction for taxes paid by petitioners on their Prarietown, Illinois farm. See note 6, supra.
The items of farm income and expense reported by petitioners on the Schedule F filed with their tax returns for the years in issue are as follows: 1973
1974
1975
INCOME:
Sale of cattle
$     788.14 $     775.00 $    2,702 Patronage dividends
--   554.69 86 Sale of grain
--   --   361 Sale of timber
--   --   663 Damage release re/
easement sale
1,000.00   --      -- Total
$ 1,788.14  ** $ 1,329.69 $ 3,812 EXPENSES:
Labor hired
$     935.00 $   5,511.75 $     509 Farm manager
--   --   7,150 Repairs & Maintenance
7,626.46 4,769.19 14,705 Interest
2,154.05 1,876.54 4,089 Rent of farm
--   --   138 Feed
2,771.35 3,362.45 1,551 Seed
336.96 --   277 Fertilizer
1,927.27 1,318.04 446 Supplies
2,017.69 405.37 129 Veterinary fees
--   63.00 119 Fuel
1,316.11 1,034.52 3,343 Taxes
--   194.00 172 Insurance
842.30 685.00 253 Utilities
934.04 2,203.25 1,481 Vehicle licenses
101.00 546.29 300 Vehicle repairs
368.68 2,675.07 -- Telephone
820.20 717.14 383 Miscellaneous
362.50 184.28 * 292 Total Cash Expenses
$  22,513.61 $  25,545.89 $  35,337 Depreciation
14,365.60 12,917.31 12,923 Total Deductions
$  36,879.21 $  38,463.20 $  48,260 Net Farm Profit or Loss
$ (35,091.07)
$ (37,093.510
$ (44,448)
*680 Petitioners' farm losses during the years in issue are attributable, in part, to a fire in 1975 which destroyed the A-frame house on the O'Brien farm. This fire was an unforeseeable circumstance which adequately explains the casualty loss deduction taken by petitioners on their tax return for 1975. [12] It does not explain any portion of the net farm loss reported by petitioners on the Schedule F filed with their tax return for 1975. However, based on the record before us, we find that a decline in cattle prices substantially below the level petitioners reasonably anticipated significantly contributed to the losses incurred in the years before us. Additionally, a drought was also a contributing factor. [13]
*681 In purchasing and owning their farm, petitioners did not have the objective to benefit from appreciation in the value of the land. In the years subsequent to petitioners' acquisition of their farm, the farm did appreciate in value, but not substantially beyond the rate of inflation and cost of improvements to the farm. Petitioners' farm did not contain recreational facilities such as swimming pools or tennis courts which are often a part of hobby loss farming operations. On the other hand, the farm was located in a popular tourist and wilderness area with Clark National Forest located only 5 miles from the farm and Lake of the Ozarks State Park located approximately 40 miles from the farm. Petitioners, together with their oldest daughter visited and skied at the Lake of the Ozarks resort in the winter. Among the relatives who visited the farm on the weekends were the father and mother of Patricia Dennis, her sister and brother and two brothers-in-law of her parents, the son of Phillip Dennis, and the brother of Phillip Dennis, who lived on the farm for months at a time. While at the farm, petitioners and their relatives stayed in the farmhouse on the Goode farm and in the *682 A-frame house on the O'Brien farm. At least by 1978, the Goode farmhouse was amply outfitted with furniture and other personal belongings including cross country skis for use around the farm and children's toys and games. [14] Petitioners worked hard on their farm most of the hours they were there. Their relatives also assisted with the work on the farm. Petitioner was a rugged man who enjoyed the outdoors and agricultural toil associated with the land. The farm also provided similar enjoyment to other members of his family, and a minor amount of more traditional recreational diversion. From 1972 through the years in issue, petitioners reported wages and business from petitioner Phillip Dennis' medical practice as follows: Year
Income From Medical Practice *
1972
$  86,270.00
1973
81,339.95
1974
83,331.58
1975
118,617.00
*683 Issue 2. Negligence Addition
During taxable years 1974 and 1975, petitioner Phillip Dennis conducted his medical practice in partnership with several other physicians. Each of the doctors in the partnership provided services to indigents under a state program providing for payment by the Illinois Department of Public Aid. On their income tax return for 1974 and 1975, petitioners failed to report all of the income they received from the Illinois Department of Public Aid. Petitioners had unreported gross receipts from the practice of medicine for 1974 and 1975 in the amounts of $ 28,221 and $ 60,182, respectively. Their income tax returns for these years were prepared by their accountant from information supplied by the partnership's certified public accountant and billing clerk. Petitioners did not review their 1974 and 1975 income tax returns prior to signing them. OPINION Issue 1. Farm losses
During each of the years in issue, 1973 through 1975, petitioners sustained substantial losses from the operation of a farm (primarily cattle raising) in central Missouri. The first issue presented for our decision is whether petitioners' operation of the farm was *684 an "activity * * * not engaged in for profit" within the meaning of section 183. If so, petitioners are limited as to the losses which may be taken with respect to the activity in accordance with section 183. Respondent contends that petitioners' farming operation was not primarily motivated by a desire for profit. Respondent points primarily to the manner in which the farming operation was conducted, petitioners' personal motives in operating the farm, and the history of losses incurred by petitioners beginning with taxable year 1972. Petitioners argue that at all times during the years in issue, they operated their farm with the intent to make a profit. After carefully reviewing the record before us, we find that until somewhere very near the end of 1975, petitioners intended to derive a profit from their farming activity. Accordingly, while the year 1975 -- particularly the latter part -- presents a close question hardly free from doubt, we decide this issue for petitioners for the years before us. Section 183(a)[15] provides that no deduction shall be allowed to an individual for expenses attributable to an activity not engaged in for profit except as provided in section *685 183(b). Section 183(b) essentially states that losses in excess of income are disallowed with respect to such an activity. Section 183(c) defines the phrase "activity not engaged in for profit" to mean any activity other than one with respect to which deductions are allowable under section 162[16] or under paragraphs (1) or (2) of section 212. [17] Thus, only if deductions would be allowable under sections 162 or 212(1) or (2) with respect to the activity, is that activity engaged in for profit. *686 A common prerequisite of deductibility under section 162 and paragraphs (1) and (2) of section 212 is a predominant purpose and intention of making a profit from the activity with respect to which the expenses are incurred. Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (19878), affd. on another issue 615 F.2d 578 (2d Cir. 1980). The taxpayer's expectation of profit need not be a reasonable one, but the facts and circumstances must indicate that he had an actual and honest objective of making a profit. Section 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 645-46 (1982), affd. in an unpublished opinion (D.C. Cir. Feb. 22, 1983). Therefore, in essence, section 183 distinguishes between nondeductible hobby losses and deductible business losses. S. Rept. No. 91-552 (1969), 1969-3 C.B. 423, 489. Accordingly, in this case we must determine whether petitioners had an actual and honest profit objective in conducting their farming *687 operation. Petitioners bear the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. While ultimately we are deciding subjective intent, that intent can be ascertained from objective factors which are entitled to greater weight than a taxpayer's statement. Section 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner,72 T.C. 659, 666 (1979)Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. per order (9th Cir. 1981). Section 1.183-2(b), Income Tax Regs., sets forth some of the relevant factors, derived principally from prior case law, which are to be considered in determining whether an activity is engaged in for profit. They are: (1) the manner in which the taxpayer carries on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) *688 the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) elements of personal pleasure or recreation. These factors are not exclusive and are to be applied according to the unique facts of each case. Accordingly, no one factor, or a majority of nine factors, need be considered determinative. Golanty v. Commissioner, supra at 426-27; Benz v. Commissioner,63 T.C. 375, 382-83 (1974). We focus first on petitioners' general plan for their farm. Initially petitioners' objective was to establish a herd of 100 cattle and several bulls from which they hoped to produce 100 saleable offspring per year. Petitioners estimated they would have gross sales of approximately $ 20,000 per year and net profits of approximately $ 5,000 per year from their cattle sales. Petitioners consulted with the conservation departments of two universities and with relatives who were *689 familiar with cattle raising, among others. This use of experts, although for the most part not paid for, is indicative of a profit objective. Section 1.183-2(b)(2), Income Tax Regs.
During 1972 petitioners made extensive capital investments in farm machinery clearly indicative of a business purpose. In February they acquired a Caterpillar tractor D7E for $ 27,760; in May they purchased a Massey-Ferguson tractor for $ 5,872; in June they acquired a Holland-Md. 1467 Maybine for $ 2,100; in July they acquired a Caterpillar tractor 955 for $ 7,745, and a two-ton truck for $ 4,052. We believe these substantial investments concurrent with the first full year of operation corroborate petitioners' credible testimony -- that they intended possibly with excessive optimism -- to farm at a profit. Their bookkeeping system, while woefully inadequate, did attempt to account for farm receipts and expenditures. Petitioners encountered several difficulties -- including falling prices, vandalism, drought, and some casualties. Additionally, they appear to have committed the classic error of many new business operations by overextending themselves and underestimating *690 start-up losses. We recognize that several of the factors in the regulation either produce mixed results or weight against petitioners' case. However, these factors do not provide a litmus paper test, and the ultimate issue we face is whether petitioners engaged in farming during the years before us with an actual and honest profit objective. We believe they did. We recognize that by the end of 1975 anyone with their eyes open would have reassessed the circumstances in view of the magnitude of consecutive losses extending over several years. Petitioner was neither slow to catch on nor an incorrigible optimist. Since petitioner enjoyed working on the land, indeed it appeared to be part of the warp and woof of his bones -- at some point near the end of 1975 he no longer had an actual profit objective and continued the operation for personal purposes. However, we cannot identify the point of this transformation with particularity and in any event, it occurred so near the end of 1975 to make a fragmentation of that year neither wise nor practical. Issue 2. Negligence Addition
Petitioners failed to report income from the practice of medicine for taxable years 1974 and *691 1975 in the amounts of $ 28,221 and $ 60,182, respectively. The second issue presented for our decision is whether this underreporting of income resulted in an underpayment of tax that was "due to negligence or intentional disregard of rules and regulations" within the meaning of section 6653(a). If so, respondent's determination that petitioners are liable for an addition to tax for 1974 and 1975 in accordance with section 6653(a) must be sustained. Respondent's determination is presumptively correct and petitioners have the burden of proving such determination to be erroneous. Ma-Tran Corp. v. Commissioner,70 T.C. 158, 173 (1978); Enoch v. Commissioner,57 T.C. 781, 802 (1972); Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioners contend that their reliance on information supplied by a certified public accountant and bookkeeper employed by the medical partnership in which petitioner Phillip Dennis participated, and their reliance on an accountant employed by petitioners to prepare their tax returns, absolves them from liability under *692 section 6653(a). We cannot agree. We believe that petitioners would have discovered the rather substantial underreporting of income for taxable years 1974 and 1975 if they had made even a cursory review of their returns. On the record before us, we must uphold respondent's determination that petitioners are liable for an addition to tax under section 6653(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue. ↩
2. Petitioners filed amended returns for taxable years 1973 and 1974. All references to petitioners' tax returns are to their returns, as amended, unless otherwise indicated. ↩
3. In 1975, petitioners moved from St. Louis to Edwardsville, Illinois which is located approximately 150 miles from their farm. ↩
4. The parties stipulated that petitioners paid $ 18,000 for their one-half interest in the Goode farm. The depreciation schedules attached to the Schedule F for each of petitioners' tax returns during the years in issue, however, indicate an allocation of $ 2,000 to the buildings and $ 6,000 to nondepreciable land cost. Presumably this figure of "$ 6,000" stems from a typographical error and should read "$ 16,000" so as to give an original aggregate basis in the Goode farm of $ 18,000 in accordance with the stipulation of facts. ↩
5. Petitioners had an oral expense-sharing arrangement with Marion Brown regarding the cattle raised on the Goode farm. ↩
6. In 1973, petitioners also purchased a one-half interest in a 60-acre farm in Prairietown, Illinois for $ 15,500. Petitioners listed their Illinois farm together with their Missouri farm under the caption "location of farm(s)" at the top of the Schedule F filed with their return for taxable years 1973 through 1975. For these years, the only other specific reference in petitioners' tax returns to their Illinois farm was a deduction of $ 87 for real estate taxes taken on the Schedule F filed with petitioners' tax return for taxable year 1975. For taxable years 1976 through 1979, petitioners listed only their Missouri farm at the top of the Schedule F filed with their return. In these latter years, reference to the Illinois farm appears only as a notation in the depreciation schedules attached to the Schedule F under the heading "memo only" and indicates a nondepreciable capital cost of $ 15,500 in the farm. Aside from these few references to petitioners' Illinois farm, no evidence was submitted into the record regarding this farm. We assume from this silence in the record that petitioners' Illinois farm was not actively operated ass a farm, either in connection with petitioners' Missouri farm or as a separate economic unit, and that the information reported in the Schedules F for the years in issue relates to the operation of petitioners' Missouri farm only with the exception of the $ 87 deduction for real estate taxes in 1975. ↩
7. The petitioners applied for and received approval for cost sharing on the construction of their cattle ponds under a program sponsored by the Soil Conservation Service of the United States Department of Agriculture. ↩
8. e farmhouse was destroyed by fire early in 1978. At that time the fair market value of the farmhouse was $ 50,000. ↩
9. Petitioners did not sell 100 or more cattle in any one taxable year from 1972 through 1979. This is due, in part, to petitioners' practice of retaining viable female calves in order to expand the herd. ↩
10. On the Schedule F filed with petitioners' tax return for taxable year 1975, petitioners reported an expense deduction of $ 509 under the printed caption "farm labor." Petitioners also reported an expense deduction of $ 7,150 under the self-designated caption "farm manager." Presumably petitioners paid their farm manager a total salary of $ 7,150 during 1975 with the $ 509 labor payment being made to other parties. For taxable years 1972, 1973, and 1974, petitioners reported expense deductions under the printed caption "labor hired" in the amounts of zero, $ 935, and $ 5,511.75, respectively. Petitioners did not report any additional labor expenses for these earlier years. It is unclear from the record what portion, if any, of the reported labor costs for the years 1972 through 1974 waspaid to the farm manager. ↩
11. Petitioners reported a casualty loss deduction of $ 4,722 on their tax return for 1975 arising out of a fire which destroyed the A-frame house on the O'Brien farm. At the time of the fire, the A-frame house had a fair market value of $ 5,000. This loss was not reflected on petitioners' Schedule F for taxable year 1975. Petitioners also reported a long-term capital gain of $ 41,138 on the Schedule D filed with their tax return for taxable year 1978 arising out of a $ 50,000 insurance payment for the Goode farmhouse which was destroyed by fire in 1978. This item of income was not reflected on petitioners' Schedule F for 1978. ↩
*. This figure includes an $ 87 deduction for taxes paid by petitioners on their Prairietown, Illinois farm. See note 6, supra.
** The income figures were taken from Schedule F (Farm Income and Expenses) of petitioners' 1974 return. However, the correct total should be $ 1,329.69 rather than the $ 829.69 total included in petitioners' return. Since the latter represents a mathematical error, we have ignored it. ↩
12. See note 11, supra.↩
13. Petitioners also contend that their farm losses during the years in issue are attributable to the theft of livestock worth between $ 6,000 and $ 7,000. We decline to find the theft loss occurred inasmuch as it was supported only by petitioners' uncorroborated testimony at trial and↩ appears to be contrary to information contained in petitioners' own tax returns. Even if we were to find as fact that the theft loss occurred we believe such loss would account for only a small part of petitioners' farm losses. 14. The Goode farmhouse was destroyed by fire early in 1978. The Form 4684 (casualties and thefts) filed with petitioners' 1978 tax return contained a detailed listing of personal property destroyed in the fire. ↩
*. Petitioners also had gross receipts from the practice of medicine for taxable years 1974 and 1975 that were not reported on their tax returns in the amounts of $ 28,221 and $ 60,182, respectively. ↩
15. Sec. 183(a) through (c) provides as follows:
SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT> (a) General Rule. -- In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩. 16. Sec. 162(a) provides in pertinent part: (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. ↩
17. Sec. 212(1) and (2) provides: In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year -- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income * * *. ↩