G. N. FARROW AND LOUISE W. FARROW, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Farrow v. Commissioner
Docket No. 11788-80.
United States Tax Court
T.C. Memo 1985-518; 1985 Tax Ct. Memo LEXIS 119; 50 T.C.M. (CCH) 1235; T.C.M. (RIA) 85518; September 30, 1985. C. Garold Sims and Rick Budd, for the petitioners. Mark H. Howard, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: By statutory notice of deficiency dated April 14, 1980, respondent determined deficiencies in petitioners' Federal income tax liabilities and additions to tax as follows: Additions to Tax
Year
Deficiencies
[1] Section 6653(b) [2] 1970 $399.08
1972
5,848.50
$2,924.25
1973
25,026.86
12,513.43
1974
33,954.95
16,977.47
After concessions, the issues for decision are: (1) Whether the deficiencies determined are barred by the statute of limitations; (2) whether understatements of gross income on petitioners' 1972, 1973, and 1974 Federal income tax returns were due to *122 fraud with the intent to evade tax; (3) whether petitioners are entitled to additional adjustments in connection with their farm equipment sales and service business for cost of goods sold, for adjustments made to inventory, and for checks and land transferred to their sons; and (4) whether respondent's motion to impose sanctions under Rule 104(c) should be granted. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Garland N. Farrow ("Garland") and Louise W. Farrow ("Louise") are husband and wife and resided in Steamboat Springs, Colorado, at the time the petition herein was filed. Petitioners timely filed their 1970, 1972, 1973, and 1974 joint Federal income tax returns. During the years in controversy, petitioners were the sole proprietors of Farrow Repair Service (hereinafter referred to as "FRS"), a business that sold and serviced large farm equipment. FRS had conducted business in Steamboat Springs, Colorado, since 1955, and was principally a family-run operation. Garland was the primary salesman and mechanic. Louise performed bookkeeping and managerial duties associated with the business. During the years in issue petitioners' adult *123 sons, Dusty Farrow ("Dusty") and Gary Farrow ("Gary"), worked for FRS as mechanics and salesmen. Gary's wife, Lorna Farrow ("Lorna") performed bookkeeping duties for the business for two months in 1974 while Louise was hospitalized. FRS received farm equipment from manufacturers on consignment.The manufacturers retained title to the equipment until it was sold by FRS. After a certain period of time, the consignment or "floor plan period" expired, and if the equipment had not yet been sold, FRS was obligated to purchase the equipment from the manufacturers. Generally, as the expiration of the floor plan period approached, Garland would increase efforts to sell the equipment and usually the equipment was sold before the floor plan expired. FRS received commissions and bonuses from manufacturers for equipment sold by FRS. One manufacturer paid a six-percent bonus for sales of equipment by FRS, if total sales exceeded $20,000. Another manufacturer paid a bonus ranging from two percent to four percent for each piece of equipment sold by FRS. FRS did not provide financing for the purchase of new farm equipment by its customers. Financing of new equipment was available to FRS' *124 customers through the manufacturers. When, however, FRS received used farm equipment on a trade-in, FRS resold the used equipment and occasionally provided financing with respect to such sales. The amount of financing provided by FRS on used equipment did not exceed $3,000 per year. FRS also provided financing for the purchase of parts and for repairs. In addition to the farm equipment sales and repair service, petitioners were sole proprietors of a cattle raising business. Ordinarily, petitioners purchased on credit a hear of cattle each spring. They grazed the cattle until the next autumn on their 300-acre ranch in Routt County, Colorado, when they would move the cattle to feedlots in Greely, Colorado, and sell the cattle the following spring. During the years in issue, petitioners made miscellaneous other investments. In 1972, 1973, and 1974, they made capital contributions in the total amount of $25,157.04 to Bear River Investors, a real estate limited partnership. Petitioners did not claim partnership losses attributable to Bear River Investors on their 1973 and 1974 Federal income tax returns, but respondent allowed those losses in computing the deficiencies determined *125 herein. Petitioners' other investments during the years in dispute included: (1) Purchase and sale of the "Kline Property" in 1972, yielding gain in the amount of $1,644; (2) purchase of the "Mann Property" in 1972; (3) purchase of stock in the Washington National Fund in the amount of $2,500; (4) purchase of stock in the Rifle Production Credit Association in the amount of $3,090; (5) ownership of 40 acres of real property in Arizona; and (6) ownership of an oil lease on real property located in La Plata, Colorado. Financial transactions of FRS, of petitioners' cattle business, and of petitioners' other investments generally were recorded by Louise in separate bookkeeping systems. Petitioners did not maintain separate bank accounts for FRS or for the cattle business, and most receipts from those businesses were deposited in petitioners' personal checking, savings, and certificate of deposit accounts at either the Routt County National Bank or the First Federal Savings and Loan Association, both located in Craig, Colorado. Petitioners' bookkeeping system had few accounting controls, contained numerous errors, and generally was maintained very poorly. Louise had completed three *126 years toward a college degree, but had taken only one high school course in bookkeeping. Garland did not have a college education and had no knowledge of bookkeeping. To the extent revealed in the record herein, the following is a summary of the bookkeeping and accounting procedures utilized by petitioners to account for the business receipts and expenses of FRS. Generally, Garland would prepare invoices for sales of farm equipment and parts, and he would prepare shop orders for repair work and for parts used on a repair job. Louise would post the invoices and shop orders to a single entry "Mrchant's Bookkeeping and Tax Record" (hereinafter referred to as "the journal"). Louise posted the invoices and shop orders to the journal once a month when business was slow, but posted the invoices and shop orders several times a week during the busier summer months. Louise generally recorded expenses and purchases of FRS in the journal when a check was issued or cash was paid. Louise modified the journal in certain respects she thought necessary to account for state sales tax owed by FRS, for freight reimbursements, and for sales of parts. As a result of her modifications to the journal, *127 however, it is impossible to distinguish therein cash sales from credit sales, and it is difficult to determine from the journal when an amount received is a payment on a customer's outstanding account with respect to a prior transaction as distinguished from a receipt with respect to a new purchase transaction. Each month numerous entries were posted out of chronological order, and the books were in general disarray. Louise recorded some bonuses received from manufacturers in the journal, but it is unclear whether all the bonuses that petitioners received were recorded.In addition, Louise failed to record in the journal sales of various items during the three years in issue. One aspect of the records pertaining to FRS that was particularly deficient concerns the employment by FRS of petitioners' sons, Dusty and Gary. Both sons worked at FRS as mechanics and salesmen and also assisted Garland in the cattle raising business. Louise had the responsibility to record the number of hours worked by FRS' employees, but, for the most part, Louise failed to record the hours her sons worked for FRS. Some of the hours her sons worked for FRS in 1973 and 1974 were noted on Louise's monthly *128 calendars. [3]
Petitioners' sons apparently received salary payments and loans from petitioners on an irregular basis. The payments took several forms, which included petitioners' personal checks, cash, and assignment of FRS' business receipts (i.e., customer checks made payable to FRS) which Louise endorsed to the order of her sons and deposited in the sons' respective bank accounts. When Louise deposited FRS' business receipts to her sons' bank accounts, she listed each payor separately on the deposit slips. The deposit slips in evidence reflect that business receipts of FRS were negotiated to petitioners' sons and were deposited to petitioners' sons' respective bank accounts as wages or loans [4] in the following amounts: FRS' Business Receipts Deposited to
Total
Year
Dusty's Account
Gary's Account
Deposits
1972
$669.50
(to Dusty & Gary jointly)
$ 669.50
1973
287.78
$1,387.31
1,675.09
1974
1,958.61
1,958.61
Total
$4,303.20
*129 In addition to the amounts listed above, petitioners loaned at least $32,871 to their sons during the years in controversy by means of checks drawn on petitioners' personal checking account. Those loans apparently were made to enable Dusty and Gary to begin construction of houses on separate but adjacent 35-acre tracts of land which petitioners claim to have transferred to their sons in 1973. When construction of the houses began in the summer of 1973, each tract of land had a fair market value of approximately $10,000. By the summer of 1974, each house was completed and occupied by petitioners' sons and their respective wives. Formal conveyances of the land by deed were not effected until 1977 (apparently in anticipation of the tax dispute involved herein), when petitioners executed written deeds transferring the respective parcels of land. The deeds recite that the two tracts of land were conveyed "as of September 30, 1973." Louise did not record in the 1973 journal the conveyance of the two tracts of land as a business expense for employee salaries, not did she record any of FRS' business receipts deposited to her sons' accounts as FRS' business expenses or employee salaries. *130 Louise did not maintain a record of accounts receivable in the journal, but Garland kept an informal list of such accounts for parts and labor in a small, spiral-bound notebook. Garland routinely updated the list of accounts receivable on the first of each month. Another calculation of FRS' accounts receivable was made by petitioners' daughter-in-law, Lorna, during the audit of petitioners by respondent. Lorna received a college degree in accounting prior to 1973 and presently is a certified public accountant. Lorna was familiar with FRS' bookkeeping system because she maintained that system for two months in 1974 while Louise was hospitalized and because she presently is employed by FRS to maintain FRS' books. During respondent's audit, Lorna assisted Louise in explaining FRS' books to respondent's agent. Because FRS did not finance the sale of new farm equipment sold on consignment, petitioners did not keep an accounts receivable ledger for such sales. The following amounts reflect the balance of FRS' accounts receivable for parts and labor as calculated by Garland (in the spiral notebook) and by Lorna: Date
Garland
Lorna
January 1, 1972
$4,125.01
$4,394.98
January 1, 1973
6,339.12
6,676.76
January 1, 1974
3,992.45
4,091.45
January 1, 1975
4,983.52
*131 Louise recorded in a separate journal petitioners' expenses and income attributable to the cattle raising business. At the beginning of each year, Louise prepared year-end summaries for the prior year of all accounts relating to FRS and to the cattle raising business, and delivered those summaries to a certified public accountant who prepared petitioners' Federal income tax returns for the years in issue. The accountant did not provide petitioners any assistance in maintaining their bookkeeping system, he did not audit their books, and he did not reconcile the summaries that Louise provided to him with the deposits that were made to petitioners' bank accounts. Although petitioners reported on their 1972, 1973, and 1974 Federal income tax returns that they used a cash method of accounting, in reality they used a hybrid system that mixed both cash accounting and accrual accounting methods. For example, expenses were recorded when disbursements were made, which indicates the cash method of accounting. On a repair job, however, sales of parts and labor charges were recorded in the journal when repair services were performed, even though payment often was received at a later date. *132 Similarly, the full purchase price of new equipment often was recorded when a downpayment was received by FRS, and later installment payments were not recorded. In calculating their cost of goods sold, which in itself indicates an accrual method of accounting, petitioners nonetheless computed inventory purchases on a cash basis by totaling only actual disbursements for inventory and omitting outstanding liabilities for inventory purchased on credit. Using the accounting methods described above, petitioners reported on their Federal income tax returns for the years in issue the following gross receipts and net profits (or losses) with respect to FRS: 1971
1972
1973
1974
FRS' gross receipts
$114,571.60 $134,210.88 $188,469.39 $209,950.27 Bonuses received
19,885.38 Less: COGS
(103,306.14)
(130,918.42)
(172,529.66)
(215,765.59)
[5] Other deductions (10,325.77)
(7,415.52)
(9,536.32)
(8,112.60)
Net profit (loss)
$939.69 $ (4,123.06)
$6,403.41 $ 5,957.46 *133 With respect to their cattle raising business, petitioners used, for the most part, the crop method of accounting. This method of accounting allowed petitioners to deduct all expenses attributable to a certain herd of cattle in the year in which the herd was sold, rather than in the year in which the expenses actually were incurred. Complicating matters further, however, petitioners deviated from the crop method of accounting for cattle expenses incurred in 1973. The herd that petitioners purchased in March 1972 -- which ordinarily would have been sold in the spring of 1973 -- was sold in the autumn of 1972. If petitioners had been consistent in their use of the crop method of accounting, they should have deducted the expenses attributable to that herd in 1972, the year in which the herd was sold. Nevertheless, expenses attributable to that herd were deducted in 1973. Petitioners reported Schedule F farm expenses and resulting net gain or loss with respect to their cattle raising business on their Federal income tax returns for the years 1971 through 1974 as follows: 1971
Date
Quantity
Price
March 24, 1970
110 head purchased
$ (19,191.90)
March 12, 1971
110 head sold
35,876.48 Gross Profit
$ 16,684.58 Less: Expenses
(14,590.42)
Depreciation
(745.00)
Net Gain
$ 1,349.16 1972
April 4, 1971
110 head purchased
$ (20,008.86)
February 17, 1972
110 head sold
40,345.20 March 13, 1972
105 head purchased
(24,260.90)
March 15, 1972
15 head purchased (3,275.90)
September 30, 1972
120 head sold
37,598.63 Gross Profit
$ 30,398.17 Less: Expenses
(19,185.27)
Depreciation
(745.00)
Net Gain
$ 10,467.90 1973
No cattle sold
Gross Profit
Less: Expenses
$ (12,086.25)
Depreciation
(745.00)
Net Loss
$ (12,831.25)
1974
March 19, 1973
89 head purchased $ (27,783.00)
[6] March 29, 1973 31 head purchased (9,480.00)
March 19, 1974
120 head sold
$ 56,591.25 [7] Other income 3,090.00 Gross Profit
$ 22,418.25 [8] Less: Expenses (23,831.50)
Depreciation
(745.00)
Net Loss
$ (2,158.25)
*134 In summary, by combining their net income or loss from both FRS and the cattle raising business, as well as interest and dividend income they received, petitioners reported on their joint Federal income tax returns the following amounts as their adjusted gross income (or loss) for 1971, 1972, 1973, and 1974: 1971
1972
1973
1974
FRS' net profit (loss)
$ 939.69
$ (4,123.06) 6,403.41 $5,957.46 Farm income (loss)
1,349.16
10,467.90 (12,831.25)
(2,158.25)
Other income
85.69
422.35 991.04 1,573.25 Adjusted Gross Income
$2,374.54
$ 6,767.19 $ (5,436.80)
$5,372.46 *135 During the course of respondent's audit of petitioners' returns, respondent's examining agent generally accepted the amounts of expenses, purchases, and inventory balances reflected on petitioners' tax returns. In addition, he verified and allowed petitioners' partnership losses in 1973 and 1974 for their interests in Bear River Investors, and allowed petitioners an increased reduction from gross income for cost of goods sold in 1973. The agent conducted his audit at petitioners' residence during 1974 and 1975. Petitioners provided the agent free access to their books and records, and, generally, were cooperative in every respect. The agent determined that there were discrepancies between petitioners' journal and their bank deposits which could not be reconciled, and he began to reconstruct petitioners' gross receipts using a combination of the bank deposits method and the specific item method of proof. The specific item method was used in addition to the bank deposits method because petitioners had failed to deposit some business receipts to their personal checking and savings accounts. For example, during the years in issue, several FRS' business receipts totaling $4,303.20 *136 were negotiated to petitioners' sons, as described earlier. Three business receipts totaling $64.74 were negotiated at a local supermarket, [9] 18 checks totaling $5,177.24, [10] were negotiated for cash, and some receipts were in fact received in cash totaling $2,753.36. [11]
The agent knew that petitioners had reported FRS' sales on an accrual method of accounting, but because FRS' *137 books were incomplete and unreliable he reconstructed petitioners' sales income from bank deposits using a cash method of accounting. Louise had informed the agent that FRS' accounts receivable were small in dollar amount ($3,000 to $5,000 annually) and that the amount of accounts receivable varied only slightly from year to year. Based on that information, the agent determined that any difference in petitioners' reconstructed gross income using a cash method of accounting rather than an accrual method of accounting would be insignificant. In addition, the agent determined that FRS had no outstanding accounts payable at the end of each year and therefore made no adjustments to gross income for such obligations. Upon concluding his audit of petitioners' 1972, 1973, and 1974 Federal income tax returns in October of 1975, the agent referred petitioners' case to respondent's Criminal Investigation Division (hereinafter referred to as "CID"). After the referral to CID, all cooperation by petitioners with respondent ceased on advice of counsel. Respondent's special agent continued to make inquiries about petitioners' business dealings. First, he contacted the manufacturers that supplied *138 farm equipment to petitioners and obtained from them some of the invoices and other records relating to FRS' dealings with the manufacturers. He determined, however, that those records were not complete and, therefore, he accepted as correct the amount of purchases and the cost of goods sold as reflected on petitioners' Federal income tax returns for the years in issue. The special agent obtained from the individuals and businesses he could identify that had purchased equipment from FRS copies of FRS' receipts and of their cancelled checks in order to verify what business dealings they had transacted with FRS during the years in issue. The special agent also identified petitioners' investments and nondeductible personal expenses to be approximately $66,500 in 1972, $44,000 in 1973, and $36,800 in 1974. For example, during the three years in controversy, petitioners invested at least $25,157.04 in Bear River Investors and at least $18,627.09 in other investments. Petitioners also paid $14,583 in life insurance premiums during the years in controversy. The special agent determined that petitioners had unreported gross receipts in the amounts of $13,584.08, $103,053.38, and $102,272.12 *139 for 1972, 1973, and 1974, respectively. Those determinations were calculated and determined in respondent's notice of deficiency as follows: [12]
Bank Deposits
1972
1973
1974
Routt Co. Nat'l. Bank
Checking
$246,349.92 $292,519.23 $401,838.69 Savings
6,347.63 497.24 10,727.98 Certificate of Deposit
2,840.00 158.35 167.17 First Federal & Assoc.
of Craig, Colo.
Savings
16,329.51 8,099.30 Certificate of Deposit
10,229.84 671.84 Total Deposits
$255,537.55 $319,734.17 $421,504.98 Plus: Business receipts
not deposited
2,478.01 7,715.53 15,336.41 Less: Non-income deposits
(31,855.22)
(34,575.89)
(43,479.11)
Total Gross Receipts
$226,160.34 $292,873.81 $393,362.28 Less: Income reported
by Petitioners: FRS business receipts
$134,210.88 $188,469.39 $209,950.27 Interest
422.35 991.04 1,573.25 Oil Lease
360.00 65.00 FRS bonuses
19,820.39 Cattle business receipts
77,943.03 56,591.25 Stock income
3,090.00 Total Reported Income
($212,576.26)
($189,820.43)
($291,090.16)
Unreported Gross Receipts
$ 13,584.08 $103,053.38 $102,272.12 *140 In his notice of deficiency, respondent accepted petitioners' calculations of cost of goods sold and beginning-of-year inventory balances. At trial, respondent allowed additional reductions in gross income for the cost of goods sold in 1974 in the amount of $11,230.09. Respondent allowed in his notice of deficiency additional deductions for Schedule F farm expenses incurred in 1974 in the amount of $21,788.03, but subsequently determined that under the crop method of accounting used by petitioners, some of those expenses more properly were accrued in 1975, the year in which the cattle was sold to which the expenses related. Respondent amended his answer to place in issue the additional Schedule F farm deductions originally allowed for 1974. At trial, held on March 22 and 23, 1984, in Denver, Colorado, respondent offered testimony from petitioners, from Dusty, Gary, and Lorna, from respondent's agents, and from an expert witness. In addition to examining those witnesses listed above, petitioners called two farm equipment dealers from western Colorado, and an expert witness. *141 Documentary evidence and stipulations of fact were submitted by the parties, and respondent filed with the Court his motions to prevent testimony, for the review of the sufficiency of petitioners' answers to respondent's request for admissions, and for sanctions, all of which were taken under advisement. OPINION Statute of Limitations
We first address the threshould question of whether respondent is barred by the statute of limitations from assessing the deficiencies determined herein. The parties agree that petitioners' Federal income tax returns were timely filed on or before April 15, 1973, for 1972; April 15, 1974, for 1973; and April 15, 1975, for 1974. Respondent's statutory notice of deficiency was dated April 14, 1980, and determined deficiencies and additions to tax totaling $97,644.54 for 1970, 1972, 1973, and 1974. Generally, respondent must issue a statutory notice of deficiency within three years after a taxpayer's Federal income tax return is filed. Sec. 6501(a). [13] If, however, a taxpayer files a false or fraudulent Federal income tax return with the intent to evade tax, section 6501(c)(1)[14] provides that respondent may assess a tax deficiency *142 at any time. In addition, if a taxpayer omits *143 from gross income an amount properly includable therein that is in excess of 25 percent of the amount of gross income stated in the return, respondent may assess a tax deficiency at any time within six years after the return was filed. Sec. 6501(e)(1)(A). [15] Thus, the statute of limitations bars respondent's deficiency determination herein for 1972 unless we find that petitioners filed a false or fraudulent Federal income tax return in that year with the intent to evade tax. Similarly, respondent's determinations for 1973 and 1974 are barred unless we find either that petitioners filed false or fraudulent Federal income tax returns for those years or that petitioners omitted an amount of gross income from their returns for those years in excess of 25 percent of the gross income that was reported on their returns. *144 Respondent's determination of a deficiency for 1970 is based on his disallowance of a claimed net operating loss carryback from 1973 to 1970. Any tax due from petitioners for 1970 may be assessed at any time before the expiration of the period within which a deficiency may be assessed for the taxable year of the net operating loss which results in such carryback. Sec. 6501(h). [16] Accordingly, the statute of limitation for 1970 will, in this instance, be the same as the statute of limitation for 1973. Petitioners argue that this action is barred by *145 the general three-year statute of limitations and that any exception to the general rule is inapplicable. Respondent contends that the statute of limitations does not bar this action because the exceptions provided in sections 6501(c)(1) and 6501(e)(1)(A) are applicable. Upon our careful consideration of all of the evidence submitted in this case, and as explained in more detail hereafter, it is our conclusion that petitioners did not file false or fraudulent Federal income tax returns with the intent to evade tax in 1972, 1973, or 1974. Accordingly, we hold that respondent's determination of a deficiency for 1972 is barred by the statute of limitations pursuant to section 6501(a). Also as explained in more detail hereafter, we find that petitioners omitted from their Federal income tax returns for 1973 and 1974 an amount of gross income that exceeded 25 percent of the gross income that was reported on those returns. Therefore, we hold that respondent's determinations with respect to 1973 and 1974 are not barred by the statute of limitations under the exception provided in section 6501(e)(1)(A). In light of our holding that the statute of limitations for 1973 is open, the deficiency *146 for 1970 based on the disallowance of the loss carryback from 1973 also is open under section 6501(h). Fraud
The issue of fraud is important in this case in deciding the applicable statute of limitations under section 6501(c)(1) and in determining whether respondent correctly determined the 50-percent addition to tax under section 6653(b). [17]
For the purposes of sections 6501(c)(1) and 6653(b), fraud is defined as an intentional wrongdoing *147 with the specific intent to evade a tax believed to be owed. McGee v. Commissioner,61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976); Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969). The burden that respondent bears of proving applicability of the section 6501(c)(1) exception to the general three-year statute of limitations is the same burden as that which respondent bears in sustaining the additions to tax for fraud under section 6653(b). Ruidoso Racing Assoc., Inc. v. Commissioner,476 F.2d 502, 505 (10th Cir. 1973); Asphalt Industries, Inc. v. Commissioner,384 F.2d 229, 232 (3d Cir. 1967), revg. 46 T.C. 622 (1966). The existence of fraud is a question of fact to be determined from the entire record. Grosshandler v. Commissioner,75 T.C. 1, 19 (1980); Stratton v. Commissioner,54 T.C. 255, 284 (1970). Fraud will never be presumed, *148 and respondent must prove fraud by clear and convincing evidence. United States v. Thompson,279 F.2d 165, 167 (10th Cir. 1960); Beaver v. Commissioner,55 T.C. 85, 92 (1970); sec. 7456; Rule 142(b). Because direct proof of fraudulent intent seldom is possible, respondent may demonstrate the requisite intent from the taxpayers' conduct and the circumstances surrounding their actions. Grosshandler v. Commissioner,supra at 19. Circumstantial evidence and reasonable inferences drawn therefrom also may establish fraudulent intent. Stone v. Commissioner,56 T.C. 213, 224 (1971); Otsuki v. Commissioner,53 T.C. 96, 106 (1969). Determinations of fraud should not be sustained under circumstances that create only suspicion. Davis v. Commissioner,184 F.2d 86, 87 (10th Cir. 1950). Negligence, whether slight or great, is not the equivalent of purposeful wrongdoing specifically intended to evade a tax that is believed to be owed. Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941). *149 It is seldom easy for the Court to determine whether a taxpayer possessed a fraudulent intent, and that task is even more difficult in this case because of the 12-year period of time that has elapsed since the events in question occurred. The parties' recollection of those events and the circumstances surrounding them undoubtedly are blurred by the passage of time, which exacerbates our efforts to form a clear understanding of the business procedures of a loosely organized, family owned and operated business whose financial records were woefully inadequate. Respondent argues herein that sufficient indicia of fraud are apparent in petitioners' conduct and in FRS' business procedures. Respondent notes that substantial understatements of taxable income occurred on petitioners' Federal income tax returns for the years in issue and that the understatements were caused by petitioners' failure to record a significant number of their equipment sales. Respondent points out that the amounts petitioners spent for investments, loans, and personal expenditures during the years in issue far exceeded the gross income reported on their Federal income tax returns for those years. Respondent *150 also argues that petitioners' practice of depositing FRS' business receipts in their sons' respective bank accounts or negotiating such receipts for cash is evidence of petitioners' alleged intent to divert FRS' gross receipts from their financial records. Respondent asserts that petitioners made several sophisticated investments during the years in issue which belie petitioners' contention that the errors in their Federal income tax returns were due to ignorance and carelessness as simple, uneducated merchants. Petitioners, on the other hand, contend that they did not make a substantial understatement of gross income on their Federal income tax returns for the years in issue. Rather, petitioners argue that respondent's method of reconstructing their income is erroneous because it fails to reflect petitioners' use of an accrual accounting method. Petitioners concede that their financial books were poorly kept and that they failed to record in their journal many transactions that should have been recorded therein. Petitioners contend, however, that the inadequacies in the records are attributable to Louise's negligence and lack of bookkeeping training and not to petitioners' calculated *151 intention to conceal the true amount of FRS' earnings in an effort to evade payment of their fair share of Federal income tax. In support of that argument, petitioners point to Louise's failure to claim all the deductions to which petitioners were entitled during the years in issue, such as partnership losses and salaries paid to their sons. Petitioners also emphasize various aspects of their conduct which they contend is inconsistent with a finding of fraudulent intent. For example, petitioners specifically identified on deposit slips the customers whose checks were deposited to their sons' respective bank accounts. In addition, petitioners fully cooperated with the revenue agent during his audit and provided him complete access to all financial records that were in their possession. Petitioners also contend that in early 1975, during the course of the audit of their 1972 and 1973 Federal income tax returns, the revenue agent advised them regarding the treatment of certain deductions petitioners intended to claim on their 1974 Federal income tax return. Petitioners assert that they complied with the agent's suggestions and that they made no other significant changes in their *152 method of computing taxable income because they relied on the agent's implied assurance that their method of computing taxable income otherwise was correct. Petitioners contend that they would not have been so foolish as to file an intentionally false Federal income tax return for 1974 at a time when their 1972 and 1973 returns were being examined. We agree with petitioners that respondent has failed to prove that petitioners' Federal income tax returns for 1972, 1973, and 1974 were filed with fraudulent intent. In our opinion, the inaccuracies in petitioners' records that caused them to understate gross income on their Federal income tax returns more properly are attributable to petitioners' negligence. Respondent emphasizes petitioners' failure to report some sales in the journal and petitioners' deposit of some of FRS' business receipts to their sons' bank accounts. That conduct would conceal FRS' income only if it occurred in tandem; that is, if the receipts that were not deposited into petitioners' bank accounts but were deposited to their sons' accounts were the same receipts that were omitted from the journal. In such a case, FRS' sales and receipts would not be traceable *153 through either the journal or through petitioners' bank accounts. Respondent identified several sales that were omitted from the journal and some business receipts that were not deposited to petitioners' bank accounts, but respondent has not demonstrated that any of FRS' business receipts were both omitted from the journal and not deposited into one of petitioners' bank accounts. Additional aspects of petitioners' conduct, in the context of this case, are inconsistent with a finding of fraud. For example, before Louise deposited a business receipt to one of her sons' bank accounts, she clearly identified the payor of the check on the deposit slip. In addition, petitioners' full cooperation with respondent's revenue agent during the audit is indicative of petitioners' intent to comply with Federal income tax laws. Cf. Stone v. Commissioner,supra at 224. Petitioners never attempted to mislead respondent's agents. They provided the revenue agent with all requested information and documents in their possession, and they did not alter or destroy any of their business records. [18] Petitioners accepted most payments from FRS customers in the form of bank checks *154 rather than in the form of cash. Lastly, petitioners were credible witnesses, and their testimony and demeanor at trial do not support a finding of fraud in this case. In summary, respondent has failed to prove by clear and convincing evidence that any understatement of petitioners' gross income was intentional and due to fraud. We therefore hold that petitioners are not liable for the additions to tax for fraud determined by respondent pursuant to section 6653(b). Substantial omission of income
We must next determine whether petitioners omitted in excess of 25 percent of their gross income from their Federal income tax returns with respect to 1973 and 1974. If so, respondent's determinations of deficiencies for those years are not barred by the statute of limitations under section 6501(e)(1)(A). For the purposes of that section, "gross income" is defined in the case of a trade *155 or business as "the total of the amounts received or accrued from the sale of goods or services * * * prior to diminution by the cost of such sales or services." Sec. 6501(e)(1)(A)(i). Respondent bears the burden of proving (1) that the amounts of income that were not reported were properly includable in gross income, and (2) that an amount in excess of 25 percent of the amount of gross income shown on the return was omitted. Estate of Whitlock v. Commissioner,494 F.2d 1297, 1301 (10th Cir.), cert. denied 419 U.S. 839 (1974); Burbage v. Commissioner,82 T.C. 546, 553 (1984), on appeal (4th Cir., Oct. 12, 1984); Bardwell v. Commissioner,38 T.C. 84, 92 (1962), affd. on another issue 318 F.2d 786 (10th Cir. 1963). Respondent determined that petitioners omitted an amount of gross income in excess of 25 percent of the gross income that was reported on their return, based on his reconstruction of petitioners' current taxable gross receipts under the bank deposits and specific item methods of proof. Respondent *156 first determined the amount of deposits that petitioners had made to their checking, savings, and certificate of deposit accounts. Respondent added to that amount the taxable receipts that petitioners had received that were not deposited to their personal bank accounts. Respondent then allowed a deduction from total taxable gross receipts for nontaxable deposits, such as loans or transfers between accounts. After calculating total gross receipts of $292,873.81 for 1973 and $393,362.28 for 1974, respondent deducted therefrom the total gross receipts that were reported by petitioners on their 1973 and 1974 Federal income tax returns and determined unreported gross receipts in the amounts of $103,058.38 and $102,272.12, respectively. Thus, if respondent's reconstructions of gross receipts are correct, there were omissions of gross income in amounts exceeding 25 percent of the amounts of gross income that were reported on petitioners' tax returns and respondent's deficiency determinations herein with respect to 1973 and 1974 are not barred by the statute of limitations pursuant to section 6501(e)(1). [19]
*157 Petitioners argue generally that respondent's agents were inexperienced and careless and utilized procedures in analyzing petitioners' bank accounts that did not adequately eliminate nontaxable deposits. We find that respondent's use of the bank deposits method was proper herein. Petitioners made various deposits to their bank accounts, the source and nature of which were not accounted for or recorded in their books and records. See Marcello v. Commissioner,380 F.2d 494, 496 (5th Cir. 1967); Harper v. Commissioner,54 T.C. 1121, 1129 (1970). Further petitioners failed to keep and produce complete financial records from which an accurate calculation of income could be obtained. In such cases, among others, respondent is justified in using other less direct methods of proving income. Epstein v. United States,246 F.2d 563, 566 (6th Cir.), cert. denied 355 U.S. 868 (1957). Respondent's agents made a conscientious effort to identify the source of petitioners' income. Respondent's special agent sent letters to all persons and businesses that were named in petitioners' journal during the years in issue and received *158 responses from about 90 percent of those persons and businesses. Those responses itemized each sale that the individual or business had transacted with petitioners. If in this process of gathering information respondent failed to entirely eliminate duplicate items, the fault and the liability lies not with respondent, but with petitioners who must bear the consequences of failing to keep adequate records. Gemma v. Commissioner,46 T.C. 821, 833 (1966). Petitioners also argue that respondent's determinations of gross income are erroneous because he failed to adjust petitioners' yearly income by the amounts of FRS' accounts receivable to reflect petitioners' use of an accrual accounting method. That argument also is unpersuasive. Respondent reconstructed petitioners' gross income under a cash accounting method relying on petitioners' bank deposits. The reconstruction of gross income under a cash accounting method easily can be converted to reflect a taxpayer's use of an accrual accounting method by adding the amount of the taxpayer's end-of-year accounts receivable to the taxpayer's total bank deposits for a given year and by subtracting therefrom the taxpayer's *159 beginning-of-year accounts receivable. Petitioners allege that respondent erred in failing to make such an adjustment. Respondent argues that the agent did estimate an adjustment to reflect petitioners' accounts receivable. Based on the information supplied by Louise, however, that the amount of FRS' accounts receivable were relatively constant from 1972 to 1974, respondent's agent determined that the effect of reflecting such an adjustment in his deficiency determinations would be insignificant. Because there was little difference in the amounts of petitioners' end-of-year accounts receivable and their beginning-of-year accounts receivable, there was little variation in the amount of petitioners' gross income as determined under a cash method of accounting as opposed to an accrual method of accounting. Petitioners contend, however, that Louise's estimate of accounts receivable omitted the amount of receivables due on sales of equipment and that she reported to respondent's agent only the amount of receivables due on sales of parts and repair services. Petitioners assert that although the amount of receivables on parts and labor generally was constant, the amount of receibables *160 on sales of equipment vary widely and often exceed several thousands of dollars. Petitioners contend that respondent should have adjusted the amount of their gross income for the years in issue to accrue the amount of accounts receivable with respect to equipment sales in the year of the sales. We disagree. Petitioners did not keep a record of accounts receivable on sales of equipment. Therefore, neither respondent's agent nor this Court has a reliable basis from which to calculate an adjustment for accounts receivable on equipment. In our opinion, respondent's method of calculating gross income was reasonable, particularly in light of petitioners' failure to maintain complete and accurate records and respondent has satisfied his burden of roof on this issue.We adopt respondent's calculations of petitioners' gross income for 1973 and 1974. Petitioners seek further reductions in gross income for the cost of goods sold and for adjustments to FRS' ending inventories in 1973 and 1974. [20] During the audit of petitioners' Federal income tax returns, respondent's agent did not dispute the amount of reductions in gross income petitioners claimed on their tax returns for the cost of *161 goods sold. Also, respondent conceded at trial that petitioners were entitled to an added reduction in gross income in the amount of $11,230.09 for the cost of goods sold in 1974, and we so hold. Petitioners contend, however, that they are entitled to a further reduction in gross income for cost of goods sold *162 in 1974 in the amount of $11,598.54. That amount is evidenced by a check issued by petitioners apparently for the purchase of equipment. That expense was recorded in the journal but was crossed off and was not included in the monthly expense totals. Louise testified that she was uncertain whether that purchase had been recorded in the journal a second time and conceded that petitioners may have accounted for the amount of that purchase through an adjustment to their inventory totals. In light of the evidence on this issue, petitioners are not entitled to the further reduction in gross income for cost of goods sold in the amount of $11,598.54. Petitioners argue in a more general sense that they incurred additional inventory costs that were not claimed on their tax returns because their books and records did not properly record the amount of petitioners' purchases. Petitioners argue that those additional costs now can be calculated from the amount of bonuses they received from manufacturers or from an approximation of their yearly estimated profit margin. See Goldsmith v. Commissioner,31 T.C. 56, 60-61 (1958). Respondent contends, and we agree, that there is *163 insufficient evidence with respect to the amount of bonuses received by petitioners and the basis upon which those bonuses were calculated to find for petitioners on this issue. With respect to the additional inventory costs based on estimated profit margins, petitioners offered testimony from two of their competitors and three studies entitled "Cost of Doing Business Study for Farm and Industrial Equipment Dealers" for 1972, 1973, and 1974. Petitioners contend this evidence substantiates the amount of profit margin common to the sales of farm equipment and thereby justifies an increase in petitioners' cost of goods sold. Respondent objected to the testimony of petitioners' competitors and to the admission of the studies on the ground that average profit margins in an industry are irrelevant to the facts of this case and they are too speculative a basis upon which to allow petitioners additional allowances for cost of goods sold. At trial, we reserved ruling on this evidentiary issue. In our opinion, evidence concerning average profit margins earned by farm equipment dealers in western Colorado is relevant to this issue and is admissible, and we therefore deny respondent's motion *164 to exclude the testimony of petitioners' competitors and to exclude the studies. Such evidence is, however, of little probative value in this case and is too speculative to serve as the basis for additional reductions in gross income for purchases petitioners allege to have made. We cannot allow increased cost-of-goods-sold allowances for any of the years involved herein based upon the evidence submitted concerning average profit margins. Petitioners assert further that they are entitled to reduce the amount of FRS' ending inventory for 1973 and 1974 in the amounts of $18,500 and $34,401.52, respectively. No specific evidence has been presented with respect to 1973, and we sustain respondent's disallowance of the reduction claimed for that year. With respect to 1974, petitioners reported a closing inventory for FRS of $62,051.46, but petitioners reported an opening inventory for 1975 of $26,651, a difference of $35,400.46 (although petitioners claim an adjustment only in the amount of $34,401.52). Respondent argues that the difference in amounts is attributable to a change in petitioners' method of accounting, and that the amount of the difference is subject to section 481(a). *165 [21] Petitioners contend that the difference is deductible because it was due to a mathematical error in computation, the correction of which is not subject to section 481. Korn Industries, Inc. v. United States,209 Ct. Cl. 559, 532 F.2d 1352 (1976); sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs. See also Underhill v. Commissioner,45 T.C. 489 (1966). *166 Petitioners also assert that during the course of respondent's audit of their 1975 Federal income tax return, the revenue agent did not modify the amount of FRS' opening inventory balance reported thereon, and in so doing, he verified the accuracy of that amount. Respondent argues, and we agree, that respondent's failure to challenge petitioners' calculation of FRS' opening inventory for 1975 does not now place the accuracy of that amount beyond question. Petitioners have offered no evidence to establish that the 1974 reported ending inventory was in error and that the 1975 reported opening inventory was the correct figure. We sustain respondent on this issue. It is evidence from petitioners' pattern of nondeductible personal expenditures that they enjoyed the use of income in amounts that exceeded the gross income they reported on their Federal income tax returns for the years in issue. Petitioners concede that they did not receive gifts or inheritances during those years. Thus, petitioners must have earned taxable income which they used for the personal expenditures. We find that petitioners omitted from the gross income reported on their Federal income tax returns for *167 1973 and 1974 amounts in excess of 25 percent of the amounts that should have been reported and the assessment of deficiencies for those years is not barred by the statute of limitations under section 6501(e)(1). Deficiency Determinations
We turn finally to discuss whether respondent's determinations of deficiencies for 1973 and 1974 are correct. Petitioners seek additional deductions for transfers of checks and real property to their sons which they claim were compensation for services rendered by their sons. Petitioners bear the burden of proof on this issue. United States v. Wainwright,413 F.2d 796, 799 (10th Cir. 1969), cert. denied 396 U.S. 1009 (1970); United States v. Bender,218 F.2d 869, 871-72 (7th Cir.), cert. denied 349 U.S. 920 (1955). [22]
Petitioners deposited FRS' business receipts directly to their sons' respective bank accounts in the amounts of $2,154.98 in 1973, and $1,958.61 in 1974. In addition, petitioners transferred to their sons by personal check $32,871 during the years 1972 through 1974, part of which *168 petitioners contend were wages. Petitioners argue that because respondent redetermined petitioners' gross income to include therein the payments to their sons, they are entitled to an offsetting deduction for that portion of the payments that was intended to compensate the sons for services rendered. Petitioners also seek a deduction in 1973 for the transfer of the two 35-acre tracts of land to their sons, valued at $20,000 ($10,000 for each tract). Petitioners contend that they transferred the properties in compensation for their sons' services and that they are entitled to deduct the value of the land as an employee salary expense in 1973, the year in which their sons assumed possession of the property. Petitioners argue that although the transfer of real property to their sons was not reflected by written deeds executed in 1973, the transfers were nonetheless valid pursuant to Colorado law. Petitioners argue that under Colorado law, an oral transfer of land is exempt from the operation of the statute of frauds if there is part performance of the contract that effectuates the transfer. Petitioners assert that their sons effected part performance of the contract by building *169 homes on the properties in 1973, and petitioners now claim deductions in the amount of the fair market value of the properties in 1973. Respondent agrees that petitioners' sons did some work for FRS and that, if compensated, petitioners are entitled to deduct payments therefor under section 162. [23] Respondent argues, however, that petitioners have failed to prove which transfers to their sons were intended to be wages and which transfers were intended to be nondeductible loans or gifts. With respect to the transfer of land, respondent argues that petitioners have failed to prove that the properties were transferred in compensation for services. Respondent points out that the transfer agreements were *170 not in writing, that there was no set time limit during which the sons would work to pay for the land, and that no formal boundaries were established on the properties at the time the sons assumed possession in 1973. Moreover, respondent contends that even if petitioners established that the land was transferred as compensation for services rendered, petitioners would be entitled to a deduction in 1977 when petitioners formally executed written deeds conveying the properties to their sons, rather than in 1973 when petitioners' sons took possession of the properties. Respondent also contends that any deduction allowed with respect to the land would be limited to petitioners' bases therein, rather than their fair market value. The extent of petitioners' sons' employment at FRS is not clear. Both Dusty and Gary testified that they worked full time throughout the year, except during the winter months when they also plowed snow for a local ski resort. It was Louise's responsibility to record the number of hours that her sons worked, but she did so only intermittently and entries on the calendars reflect that the sons worked far fewer hours than petitioners allege. Although petitioners *171 claimed deductions in the amounts of $1,599.05 in 1972, $1,405.80 in 1973, and $277.80 in 1974 on their Federal income tax returns for wage payments made to their employees, they seek additional deductions for payments to their sons. As far as the record indicates, petitioners did not issue Forms W-2 to their sons, and the sons did not include in their income the amount of any payments from petitioners as wages on their individual Federal income tax returns for the years in issue. It is evident that Dusty and Gary worked for FRS on at least a periodic basis, and that petitioners are entitled to deduct compensation paid to their sons in that capacity. We agree with respondent, however, that petitioners have not substantiated that any portion of FRS' business receipts endorsed to their sons was intended as compensation rather than as loans. In light of petitioners' admission that they frequently made loans to their sons during the years in issue to assist them in building their homes, we cannot allow petitioners additional deductions without specific and reliable evidence that demonstrates what funds deposited to the sons' accounts were intended to be compensation. The transfer *172 of real property by petitioners to their sons raises three issues: (1) Whether the land, for Federal income tax purposes was transferred in 1973; (2) whether the transfer of the land was intended to be compensation; and if so, (3) whether a deduction for the transfer of the land would be limited to the fair market value of the land or to petitioners' bases therein. The parties do not agree whether Federal or state law is controlling with respect to when the transfer of land occurred. Generally, under Federal income tax law, ownership of real property is transferred when the burdens and benefits incident to ownership of the property pass to the transferee. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). In Blake v. Commissioner,20 T.C. 721 (1953), however, real property was transferred to compensate the transferee for services rendered and we looked to state law to determine when title to real property passed. Blake v. Commissioner,supra at 728. The question of which law to apply, Federal tax law or state real property law, to determine whether petitioners conveyed land to their sons in 1973 is, *173 however, largely academic because petitioners' argument fails under either analysis. In 1973, petitioners' sons certainly enjoyed some benefits of the properties by occupying the land and building homes thereon. There is no evidence in the record, however, that would lead to the conclusion that the burdens of ownership, such as the payment of real property taxes or the assumption of liability for all risks associated with the land, passed to petitioners' sons in 1973 as required for a transfer of land to be effective under Federal tax law. Under Colorado law, petitioners also would not be entitled to a deduction in 1973 for the transfer of land to their sons. The doctrine of part performance has been read very narrowly by Colorado state courts and has been used most often to validate oral contracts between adjacent landowners with respect to the true location of a boundary. See, e.g., Chappell v. Bonds,677 P.2d 955 (Colo. 1983); Schleining v. White,163 Colo. 481, 431 P.2d 458 (1967); Sobol v. Gulinson,94 Colo. 92, 28 P.2d 810 (1933). In addition, Colorado courts have held that before a party may use the doctrine of part *174 performance to remove an oral contract concerning real property from the operation of the statute of frauds, all the essential terms of the contract must be established by competent evidence and shown to be definite, certain, clear, and unambiguous. Mestas v. Martini,113 Colo. 108, 155 P.2d 161 (1944). Certainly, the alleged oral conveyances of land by petitioners in 1973 do not meet that standard under the facts of this case. Therefore, we hold that petitioners are not entitled to a deduction for the transfer of real property to their sons in 1973 because petitioners have failed to prove that the land was conveyed prior to 1977. Petitioners' Federal income tax liabilities for 1977 are not at issue herein, and we do not decide whether the land was transferred to the sons as compensation for services in that year. Respondent raised by amended answer an issue with respect to cattle expenses in the amount of $10,160.50 that petitioners deducted in 1974 which were attributable to cattle that was sold in 1975. Respondent initially allowed a deduction of those expenses in 1974, but now argues that under the crop method of accounting used by petitioners in their *175 cattle raising business, those expenses are properly deductible in 1975, the year in which the herd to which those expenses are attributed was sold. Petitioners apparently concede this issue. We therefore sustain respondent's determination with respect thereto. Respondent filed written motions seeking our review of the sufficiency of petitioners' answers to respondent's request for admissions and seeking the imposition of sanctions against petitioners pursuant to Rule 104(c). Specifically, respondent seeks dismissal of petitioners' action herein for failure to timely respond to respondent's interrogatories and request for production of documents. In light of our disposition of the case on the merits, we deny respondent's motion for sanctions. Appropriate orders will be issued. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the years in dispute, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Respondent determined a deficiency for 1970 based solely on his disallowance of a net operating loss carryback from 1973.↩
3. The calendar for 1973 reflects 24 hours worked by Dusty, but does not reflect any hours worked by Gary. The calendar for 1974 reflects 87 hours worked by Dusty and 89 hours worked by Gary.↩
4. The record does not specify to our satisfaction what portion of FRS' business receipts deposited to the sons' bank accounts was attributable to wages and what portion was attributable to loans. Some of the deposit slips that Louise filled out are noted with the word "wages" or the word "loan," but we are doubtful that those notations were made at the time the deposits were made. Rather, it appears that those notations were made during respondent's investigation or in preparation for trial.↩
5. Included in the category of other deductions were salary expenses paid to employees excluding petitioners' sons in the amounts of $1,599.05, $1,405.80, and $277.80 for 1972, 1973, and 1974, respectively.↩
6. On March 30, 1973, petitioners received a check in the amount of $242.42 from the cattle dealer for cattle that was not delivered. That check was not deposited to any of petitioners' checking accounts but was negotiated for cash. ↩
7. Other income included a $3,090.00 gain on petitioners' sale of "PCA Stocks." Respondent determined that that amount should be reported as capital gain. ↩
8. Petitioners overstated their expenses on their 1974 return in the amount of $12,831.25, itemized as follows: (a) $745 as depreciation expense that also was deducted separately; (b) $12,086.25 for expenses that also were claimed in 1973. Petitioners incurred feed expenses in 1974 in the amount of $9,691.35, which were not claimed on petitioners' return and which respondent allowed on audit, thereby reducing the amount of petitioners' overstatement of expenses to $3,139.90.↩
9. The following items were negotiated at a local supermarket: ↩
Check Date
Check Amount
03-29-72
$20.37
10-05-73
$20.47
07-05-74
$26.90
$67.74
10. The following items were negotiated for cash at petitioners' banks: ↩
Check Date
Check Amount
Check Date
Check Amount
07-03-72
$ 261.02
02-04-74
$ 62.13
09-05-72
653.69
02-23-74
200.89
$ 914.71
05-22-74
1,000.00
06-05-74
40.36
02-06-73
$1,971.95
06-10-74
10.35
08-26-73
54.71
08-01-74
52.28
09-26-73
10.25
08-04-74
79.95
11-28-73
467.50
08-13-74
29.13
$2,504.41
08-13-74
116.76
08-14-74
103.19
08-23-74
41.85
08-25-74
21.23
$1,758.12
11. Total cash receipts of FRS that were identified were $53.01 in 1972, $365.52 in 1973, and $2,334.83 in 1974.↩
12. The figures reflect certain concessions made by respondent after the initial determinations.↩
13. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. ↩
14. Section 6501(c)(1) provides: (c) Exceptions.-- (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
15. Section 6501(e)(1)(A) provides: (e) Substantial Omission of Items.--Except as otherwise provided in subsection (c)-- (1) Income taxes.--In the case of any tax imposed by subtitle A-- (A) General rule.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph-- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; * * *↩
16. Section 6501(h) provides: (h) Net Operating Loss or Capital Loss Carrybacks.--In the case of a deficiency attributable to the application to the taxpayer of a net operating loss carryback or a capital loss carryback (including deficiencies which may be assessed pursuant to the provisions of section 6213(b)(2)↩), such deficiency may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the net operating loss or net capital loss which results in such carryback may be assessed.
17. Section 6653(b) provides: (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩
18. Froeber v. Commissioner,T.C. Memo. 1984-139; Dagon v. Commissioner,T.C. Memo. 1984-138; Vento v. Commissioner,T.C. Memo. 1984-6↩.
19. Respondent's calculations were as follows: ↩
Omitted taxable
25% of amount
receipts
stated in the return
1973
.25 times $189,820.43 =
$103,053.38
EXCEEDS
$47,455.11
1974
.25 times $291,290.16 =
$102,272.12
EXCEEDS
$72,772.54
20. Respondent raises a preliminary argument that the issues concerning ending inventories and other issues (discussed infra) concerning transfers to petitioners' sons are not properly before the Court because the issues were not raised in the pleadings and were not tried by the express or implied consent of the parties pursuant to Rule 41(b)(1). We disagree. Rule 41(b)(1)↩ liberally allows the amendment of pleadings and states specifically that "failure to amend does not affect the result of the trial of these issues." Respondent was aware several months before trial that petitioners intended to raise these issues. We therefore deem the pleadings to be amended so as to raise the issues of petitioners' entitlement to additional reductions in petitioners' gross income.
21. Section 481(a) provides: SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING. (a) General Rule.--In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")-- (1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then (2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.↩
22. Cooperatein v. Commissioner,T.C. Memo. 1984-290↩.
23. Section 162 provides in relevant part: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩